UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
LINDA J. BAMFORD,                         )
                                          )
            Plaintiff,                    )
                                          )
            v.                            )       Civil Action No. 12-10575-JLT
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
            Defendant.                    )
_____)

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION
TO REVERSE OR REMAND COMMISSIONER'S DECISION AND
DEFENDANT'S MOTION TO AFFIRM COMMISSIONER'S DECISION**
[Docket Nos. 11, 16]

February 14, 2013

Boal, M.J.

This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration ("Commissioner") regarding an individual's entitlement to Social

Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI")

benefits.  Linda J. Bamford ("Plaintiff" or "Bamford") asserts that the Commissioner's decision

that she was not disabled was in error, [Docket No. 11], and the Commissioner, in turn, has

moved to affirm [Docket No. 16].[1]  This Court heard oral argument on the motions on February

6, 2013.  For the following reasons, I recommend that the District Court remand the case for

reconsideration in light of the findings contained herein.

_____

[1]  The parties' motions have been referred to this Court for a report and recommendation.
Docket No. 15.

1

## I.      STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence.  See 42 U.S.C. §§ 405(g) and 1383(c)(3).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Supreme Court has defined substantial evidence as "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts.  Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).  A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II.     FACTS AND PROCEDURAL HISTORY

### A.      Procedural History

Bamford filed applications for DIB and SSI benefits on March 3, 2009, alleging disability since March 31, 2007.  (Administrative Record ("AR") 181, 188).  The applications were denied

initially on August 13, 2009 (AR 59-60, 63-66), and upon reconsideration on January 21, 2010. (AR 61-62, 67-69).  Administrative Law Judge ("ALJ") Matthew Levin conducted a hearing on September 22, 2011, which Bamford attended with her attorney.  (AR 30-58).  The ALJ received testimony from Bamford and Kathleen Bier, a vocational expert.  (Id.).  On October 7, 2011, the ALJ issued his decision finding Bamford not disabled from March 31, 2007, the alleged onset date, to the date of his decision.  (AR 6-27).

On January 17, 2012, the Appeals Council denied review.  (AR 1-5).  The ALJ's decision then became the Commissioner's final decision.  Bamford filed this action on March 23, 2012. Docket No. 1.

B.      Background

Bamford was forty-three years old on March 31, 2007, the onset date of her disability. (AR 214).  Beginning in April 1998, Bamford worked as a residential manager at a homeless shelter.  (AR 229).  She alleges that pain forced her to leave the position in March 2007.  (AR 228).  She found employment in December 2007 as a paraprofessional, but worked only four months.  (AR 229).  She has not worked since.  (AR 33).

According to Bamford, her routine at the time of the hearing consisted of waking up, taking her medicine, lying back down and spending most of the day in bed.  (AR 47-48).  She also testified that she was limited to standing for twenty minutes and sitting for twenty minutes. (AR 39).  Bamford's niece cleans her house and does the laundry.  Her brother drives her.  (AR 45).  In a report dated approximately two years before the hearing, she indicated that she stretched (AR 249), cleaned (AR 249), shopped three times per week (AR 253), drove (AR 249-253), cooked (AR 252), did housework (AR 252-253), regularly attended her son's sports games

(AR 254) and socialized with family members (AR 253-254).

At various times, Bamford has been diagnosed with a lateral meniscal tear of the right knee (AR 275), degenerative joint disease of the right knee (AR 275), osteoarthritis of the right knee (AR 277), postero-lateral disc herniation (AR 326), cervical spondylosis (AR 326), mild degenerative disc changes (AR 672), diabetes (AR 746), and uncontrollable jerking (AR 902).

   C.    The Medical Evidence - Physical Impairments

   1.    Dr. Mark Bulman

On June 20, 2007, Dr. Mark Bulman of the South Shore Hospital performed arthroscopy of Bamford's right knee and gave the postoperative diagnosis of lateral meniscal tear and degenerative joint disease of the right knee.  (AR 275).  On June 28, 2007, Plaintiff noted she was doing much better since her arthroscopy and Dr. Bulman noted she had significant symptomatic improvement.  (AR 278).  However, as of January 4, 2007, the medical records indicate that Plaintiff received injections in her right knee and the knee was still painful.  (AR 280).  An x-ray examination on June 7, 2009 showed degenerative arthritis of the right knee. (AR 387).

   2.    Dr. Sin Choo

On September 17, 2008, Dr. Sin Choo of Boston Medical Center examined Bamford and found she had neck pain with symptoms of left cervical radiculopathy.  (AR 544).  On October 6, 2008, an MRI examination revealed disk herniation at the C6-7 level on the left with nerve root impingement, and on November 19, 2008, Bamford underwent an EMG examination which revealed acute left C6 radiculopathy.  (AR 424).  Dr. Choo informed Bamford that she could benefit from surgery to relieve the pain in her neck.  (AR 424).  Bamford elected not to follow

4

Dr. Choo's advice because the bone fusion surgery scared her.  (AR 35).

     3.     <u>Dr. Sarah Murphy</u>

On August 15, 2011, Dr. Sarah Murphy of South Shore Medical Center, Bamford's

primary care physician, reported that Plaintiff complained of chronic back pain, type II diabetes

mellitus, and involuntary jerking movements.  (AR 318, 898).  Dr. Murphy found that Plaintiff

had some point tenderness in the lumbar region, but had a full range of motion of the

lumbosacral spine.  (AR 899). On September 9, 2011, Dr. Murphy agreed, without specifics, that

Plaintiff met the criteria of Section 1.02 of the Listing of Impairments.  (AR 890).

     4.     <u>Dr. Simon Tenenbaum</u>

Dr. Simon Tenenbaum conducted a consultative examination for the Social Security

Administration and submitted a report on June 26, 2008.  (AR 318).  He noted that Plaintiff had a

ruptured disk in her cervical spine, mild lateral osteoarthritis in her right knee, and complained

of low back and knee pain.  (AR 318).  Bamford also reported that her neck pain had worsened.

(AR 318).  Dr. Tenenbaum also stated that Plaintiff could stand for thirty minutes, walk two

blocks, sit with some fidgeting, and had no trouble getting up from her chair, walking, turning

around, or sitting down.  (AR 318-19).  An x-ray showed mild lateral osteoarthritis of the right

knee.  (AR 320).

     5.     <u>Dr. John Manuelian And Dr. Phyllis Sandel</u>

Drs. John Manuelian and Phyllis Sandel of the Disability Determination Service assessed

Plaintiff's physical RFC on August 12, 2009 and January 20, 2010, respectively.  (AR 333, 639).

Their conclusions were identical.  Both opined that Plaintiff could occasionally lift/carry ten

pounds, frequently lift/carry less than ten pounds, stand or walk for two hours in an eight-hour

day, and sit for six hours in an eight-hour day.  (AR 334, 640).  They also concluded that

Plaintiff could occasionally climb stairs, stoop, kneel, crouch and crawl; but that she could never

climb ladders, ropes or scaffolds.  (AR 335, 641).

   D.  The Medical Evidence - Mental Impairments

   Plaintiff has struggled over the years with drug and alcohol abuse and has been treated

for bipolar depression, dependence and generalized anxiety.  She was admitted to Jordan

Hospital in April 2008 after an intentional drug overdose.  (AR 292, 305). Nevertheless, she

denied that she attempted to commit suicide. (AR 312, 315).

   1.  February 2011 Hospital Visits

   On February 3, 2011, Plaintiff reported to South Shore Hospital after drinking five beers

and taking ten valium tablets where she told hospital staff that she wanted to kill her brother and

herself.  (AR 688).  Plaintiff was then transferred to Arbour-Fuller Hospital and stayed there

from February 6, 2011 to February 11, 2011.  (AR 698). She was diagnosed with mood disorder,

opiate withdrawal, and alcohol abuse. By the time of her discharge, it was noted that her mood

was stable.  (AR 698).

   On February 24, 2011, she was admitted to Pembroke Hospital after she ingested valium,

but denied that she tried to take her own life.  (AR 774).  She told hospital staff that she had

stopped her medication (AR 774), and that, save for a three-year period in the 1980s, she had

abused alcohol for thirty-two (32) years.  (AR 776).  At the time of her admission to Pembroke

Hospital, Plaintiff had a Global Assessment of Functioning ("GAF")[2] score of 40.  (AR 785).

---

   [2] Another court defined the GAF scale as follows:

   The GAF is a subjective determination based on a scale of 100 to 1 of the

2.      Arbour Counseling Services - Ms. McCutchen and Dr. Hardman

Plaintiff also underwent treatment at Arbour Counseling Services during 2011 for alcohol

dependence, major depression, and generalized anxiety.  (AR 856).  The record reflects that

Plaintiff's condition improved over the course of her treatment at Arbour Counseling Services –

in part due to the fact that she stopped drinking alcohol in February 2011.  (AR 15, 869, 876,

878).  She had a relapse with respect to drinking in April.  (AR 878).  By March 16, 2011, the

therapist noted that Plaintiff had a calmer mood, was sleeping better, had more energy, had not

abused substances, and was feeling less depressed.  (AR 853).  On May 23, 2011, her GAF score

had improved to 55.  (AR 866).  Nevertheless, she experienced increased frustration due to

increased pain.  (AR 869).

On April 11 and 12, 2011, Plaintiff met with therapist Jean McCutchen.  She opined that

Plaintiff's impairments met the criteria of sections 12.04 (affective disorders) and 12.06

(anxiety-related disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  (AR

836-838). Dr. George Hardman, Plaintiff's psychiatrist, cosigned Ms. McCutchen's opinions one

---

clinician's judgment of the individual's overall level of functioning.  It considers
psychological, social, and occupational functioning on a hypothetical continuum
of mental health-illness.  A score of 50 is on the borderline between serious and
moderate symptoms.  A GAF between 41 and 50 indicates serious symptoms
(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any
serious impairment in social, occupational, or school functioning (e .g., no
friends, unable to keep a job), while one between 51 and 60 indicates the
individual has moderate symptoms or moderate difficulty in social, occupational,
or school functioning.

Bermontiz-Hernandez v. Commissioner of Social Security, No. 11-1963, 2013 WL 149640, at *5
(D.P.R. Jan. 14, 2013) (internal quotations, citations and modifications omitted).

week later.  (AR 836-838).  Dr. Hardman and Ms. McCutchen also completed an RFC

questionnaire on April 12, 2011, in which they indicated only mild to moderate mental

limitations with only two limitations of moderately severe level, but without any severe

limitations.  (AR 839-840).  They further indicated that Bamford had serious problems with pain

in her knees and shoulder.  (AR 840).

III.  DISCUSSION

An individual is entitled to DIB benefits if, among other things, she has an insured status

and, prior to its expiration, is disabled.  See 42 U.S.C. § 423(a)(1)(A) and (E).  Entitlement to

SSI, on the other hand, requires a showing of both disability and financial need.  See 42 U.S.C. §

1381a.  Bamford's need, for purposes of SSI, and her insured status, for purposes of DIB, are not

challenged.

A.  Disability Standard and the ALJ's Decision

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which . . . can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(A).  See also 42 U.S.C. § 1382c(a)(3)(A) (similar).  An

individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he
> is not only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or whether he would
> be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See generally Bowen v. Yuckert, 482 U.S. 137,

146-49 (1987).

8

"Under the Social Security regulations, an individual is *not* disabled if alcoholism or drug addiction is 'a contributing factor material to' the determination that the individual is disabled." Randall v. Astrue, No. 09cv11273, 2011 WL 573603, at *1 (D. Mass. Feb. 15, 2011) (citing 42 U.S.C. § 423(d)(2)(C)) (emphasis in original).  "In other words, a claimant is not entitled to disability benefits *unless* his limitations would remain disabling *even in the absence of* drugs or alcohol." Id. (emphasis in original).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment?  A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> . . . .
>
> Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

At step one, the ALJ concluded that Bamford had not engaged in any substantial gainful activity since her disability onset date of March 31, 2007.  (AR 12, finding 2).

At step two, the ALJ found that Bamford had the following severe impairments: degenerative disc disease of the cervical spine, degenerative joint disease of the right knee,

diabetes mellitus, depression, anxiety and polysubstance abuse.  (AR 12, finding 3).

At step three, the ALJ found that Bamford's depression, anxiety and substance abuse met section 12.04 of the Listings.[3]  (AR 15, finding 4).  Nevertheless, the ALJ found that in the absence of drug and alcohol abuse, Plaintiff would not have an impairment or combination of impairments that met or medically equaled any Listing.  (AR 17, finding 6).  However, the ALJ opined that Plaintiff's remaining limitations would still constitute severe impairments.  (AR 17, finding 5).

In assessing residual functional capacity, the ALJ found that, if plaintiff stopped her substance abuse, she had:

> the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally lift 10 pounds and frequently lift less than 10 pounds, can only occasionally climb stairs, balance, stoop, kneel, crouch and crawl, can only occasionally reach overhead with both upper extremities, cannot perform pushing or pulling with the right lower extremity, she would be limited to performing simple – unskilled work, she could maintain attention and concentration for two hour increments throughout an eight hour workday, and could maintain occasional social interaction with the general public.

(AR 18, finding 7).

At step four, the ALJ found that Plaintiff would be unable to perform past relevant work, even if she ceased her substance abuse.  (AR 20, finding 8).

Finally, at step five, the ALJ found that Plaintiff "would be capable of making a successful adjustment to work that exists in significant numbers in the national economy," if she stopped her substance abuse.  (AR 22, finding 12).  Thus, the ALJ found that Plaintiff was not

---

[3] He further found that Bamford had the non-severe impairment of involuntary twitching. (Id.).

disabled within the meaning of the Act.  (AR 22, finding 13).

B.    Plaintiff's Challenge to the ALJ's Decision

Bamford argues that the ALJ's finding that she was not disabled was not supported by substantial evidence for three reasons: (1) the ALJ refused to consider with any substantial weight the listing information and residual functional capacity questionnaire filled out by Ms. McCutchen and co-signed by Dr. Hartman one week later (Mem. at 6);[4] (2) the ALJ's decision is internally inconsistent with respect to Bamford's credibility (Mem. at 6-7); and (3) the ALJ erred by making a negative inference from Bamford's decision not to undergo recommended surgery (Mem. at 7-8).

1.    Residual Functional Capacity Questionnaire

Plaintiff first argues that the ALJ erred by refusing to consider with any substantial weight a form filled out by Ms. McCutchen on April 11, 2011 and co-signed by Dr. Hardman on April 19, 2011.  Mem. at 6.  She also argues that the ALJ erred by similarly refusing to give substantial weight to a residual capacity questionnaire co-signed by Dr. Hardman and Ms. McCutchen.[5]  Id.

In his decision, the ALJ stated that he assigned "little weight" to both forms because "they were completed by a non-acceptable treating source, the claimant's therapist, Jean McCutchen.  (AR 19).  The forms were only signed by the claimant's treating physician, Dr.

_____

[4] "Mem." refers to the Plaintiff's Memorandum in Support of Motion to Remand or Reverse Decision of Social Security Administration.  Docket No. 14.

[5] In his decision, the ALJ stated that the Residual Functional Capacity Questionnaire was also completed by Ms. McCutchen and co-signed by Dr. Hardman a week later.  (AR 19).  However, the only date on the questionnaire is April 11, 2011.  It is not clear whether Ms. McCutchen and/or Dr. Hardman completed the questionnaire.

Hardman, a week later." (AR 19). He also stated, among other things, that although Dr.

Hardman signed the forms, they were inconsistent and unreliable because Bamford "testified that

she only saw him once every two months for 10 to 15 minutes to review her medications." (AR

20). In addition, the ALJ found that the findings in the two forms were inconsistent with each

other. (AR 20). He also points out that the forms were filled out only two months after she

began treatment and it is unclear whether the forms took into consideration Bamford's substance

abuse problems. (AR 20). Given that later treatment notes showed improvement in Bamford's

symptoms, he concludes that the forms "were commenting on a time when the claimant was still

abusing substances as [Dr. Hardman] signed it very close to the period when she ceased her

substance abuse." (AR 20).

"Regardless of its source," the regulations require that "every medical opinion" in the

administrative record be evaluated when determining whether a claimant is disabled under the

Act. 20 C.F.R. §§ 404.1527(d), 416.927(d). "Acceptable medical sources" include physicians,

psychologists and psychiatrists. 20 C.F.R. §§ 404.1513, 416.913(a). In addition, the

Commissioner may rely on "other sources" to provide evidence of "the severity of [a plaintiff's]

impairment." 20 C.F.R. § 404.1513(d). Such other sources include, inter alia, other medical

professionals, such as social workers and therapists. Id.

Although not required to do so, see Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir.

1991), an ALJ should give "more weight to the opinions from the claimant's treating physicians,

because these sources are likely to be the medical professionals most able to provide a detailed,

longitudinal picture of the [claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c)(2). A

treating source's opinion is entitled to controlling weight when it is well supported by medically

acceptable clinical and laboratory diagnostic techniques.  Id.; Social Security Ruling ("SSR")

96-2p, 1996 SSR LEXIS 9.

When a treating source is not given controlling weight, the hearing officer must then

consider whether the treating source's opinion deserves "substantially greater weight."  Conte v.

McMahon, 472 F. Supp. 2d 39, 48 (D. Mass. 2007) (citation omitted).  This analysis is

performed by weighing the conflicting evidence in accordance with a variety of factors,

including the length of the treatment relationship and the frequency of examination; the nature an

extent of the treatment relationship; the supportability of the opinion; the consistency of the

opinion with the rest of the record; and the specialization of the treating physician.  Id. (citing 20

C.F.R. § 404.1527(d)).

In addition, opinions from "other sources" can be used to show an impairment's severity.

Smith v. Barnhart, No. 04-30122, 2005 WL 548319, at *7 (D. Mass. Mar. 4, 2005).  The ALJ

may not completely disregard opinions from "other sources" just because they are not

"acceptable medical sources."  Id.; Mitchell v. Astrue, No. 09-1258, 2010 WL 1994695, at *7

(C.D. Cal. May 14, 2010) (citation omitted).  The ALJ must consider the opinion of "other

sources" by considering, among other factors, "'how frequently the source has seen the

individual,' '[h]ow consistent the opinion is with other evidence,' and '[w]hether the source has

a specialty or area of expertise related to the individual's impairment(s).'"  Mitchell, 2010 WL

1994695 at *7.

The ALJ appears to have given little weight to the listing form and the residual capacity

questionnaire mainly on the basis that it was filled out by a non-acceptable medical source.

However, the forms were co-signed by the treating physician, Dr. Hardman, and were therefore

adopted by him.  See Slavens v. Astrue, No. CV-10-5103-JPH, 2012 WL 123130, at *4 (E.D.

Wash. Jan. 17, 2012); Conte, 472 F. Supp. 2d at 47-48; Smith, 2005 WL 548319 at *7.

The ALJ also noted that the forms were "inconsistent and unreliable because [Bamford]

testified that she only saw [Dr. Hardman] once every two months for 10 to 15 minutes to review

her medications."  (AR 19-20).  Bamford in fact testified that she initially saw Dr. Hardman

every month.  (AR 41).  She only started seeing Dr. Hardman every two months shortly prior to

the hearing.  (Id.).  She also testified that the visits lasted twenty to thirty minutes.  (AR 42).

The ALJ is correct that the listing questionnaire and the residual capacity questionnaire

answers appear to be inconsistent.  The questions, however, are not identical.  While the listing

questionnaire indicated marked restrictions in activities of daily living, maintaining social

functioning, concentration, persistence, or pace, and repeated episodes of decompensation, the

residual capacity questionnaire indicated only mild to moderate mental limitations with only two

limitations of a moderately severe level and not severe limitations.[6]  (Compare AR 837-838 with

AR 839-840).  However, the ALJ must contact a treating physician to seek clarification when the

report contains a conflict or ambiguity that must be resolved.  20 C.F.R. § 404.1512(e)(1).  This

regulation requires that the ALJ "recontact the treating physician only when the ALJ cannot

determine the basis of a treating physician's opinion from the record."  Abubakar v. Astrue, No.

11-cv-10456-DJC, 2012 WL 957623 (D. Mass. Mar. 21, 2012).  "Accordingly, an ALJ must

contact the medical source only when there is ambiguity in the opinion of the treating physician,

not when evaluations are inconsistent with other information in the record or when the ALJ finds

---

[6] The Social Security regulations define "marked limitation" as "more than moderate but less than extreme."  20 C.F.R. Pt. 404 Subpart P., App. 1 § 12.00(C).

the treating physician's opinion unpersuasive." Id. (citation omitted).

Here, there appears to be an inconsistency between the two forms signed by Dr. Hardman. Both forms were signed in April 2011. Other than an initial psychiatrist evaluation (AR 844-46), it does not appear that the record contains any other records from Dr. Hardman. Accordingly, the Court finds that the ALJ had a duty to recontact Dr. Hardman in order to attempt to explain the inconsistency.

In light of the factual and legal errors committed by the ALJ in assigning weight to the forms signed by Dr. Hardman and Ms. McCutchen, and his failure to recontact Dr. Hardman, the Court finds it necessary to remand the matter so that the ALJ can properly weigh that evidence in a manner consistent with this opinion.

> 2.      The ALJ's Credibility Finding

Bamford argues that the ALJ's decision regarding her credibility is internally inconsistent. Mem. at 6. This Court disagrees.

In determining a claimant's RFC, an ALJ must consider a claimant's subjective allegations of pain and functional limitations, but he is not required to take those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 194-95 (1st Cir. 1987); Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986); Winn v. Heckler, 762 F.2d 180, 181 (1st Cir. 1985); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 SSR LEXIS 4. Specifically, the ALJ must consider the so-called "Avery factors," which are the claimant's daily activities, functional restrictions, non-medical treatment, medications and side-effects, precipitating and aggravating factors, and the nature,

location, onset, duration, frequency, radiation, and intensity of the pain.  Avery, 797 F.3d at 29.

If an ALJ determines that a claimant's testimony is not credible, the judge "must make specific

findings as to the relevant evidence he considered in determining to disbelieve the [claimant]."

Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  An ALJ is not

required to discuss each of the Avery factors in order to sufficiently support a credibility

determination.  See, e.g., Foley v. Astrue, No. 09-10864, 2010 U.S. Dist. LEXIS 60174, * 21 (D.

Mass. June 17, 2010).

        In this case, the ALJ complied with Avery because he received testimony from Plaintiff

regarding her daily activities (AR 36, 47-49); the nature, duration, and frequency of her

symptoms (AR 34, 36, 39); her functional limitations (AR 36, 39, 45, 48); the side effects of her

medications (AR 35-38, 42-43, 47) and her medical treatment.  (AR 35-39).

        The ALJ found that Bamford was credible concerning her symptoms as referred to in her

Emergency Department Records from South Shore Hospital and medical records from Arbour-

Fuller Hospital and Pembroke Hospital.  (AR 16).  However, he also found that Bamford's

statements concerning the intensity, persistence and limiting effects of those symptoms were not

credible because they were inconsistent with the medical record.  (AR 19).

        The ALJ's decision is supported by substantial evidence.  He set out specific reasoning in

support of his credibility determinations and he made specific findings regarding the evidence

that he considered in determining that Bamford was not fully credible.  For example, the ALJ

discussed medical evidence demonstrating that, contrary to Bamford's claims, she could stand

longer than 20 minutes.  (AR 19, citing AR 39, 318).  In addition, the ALJ cited to a lumbar

spine MRI showing only mild findings.  (AR 19, citing AR 672).  Also, he pointed out that

16

Plaintiff's conditions were responsive to treatment.  (AR 19, citing AR 399).  The ALJ stated

that Bamford reported feeling better and that she was planning to start small projects around her

home.  (AR 19, citing 869, 876, 878).  Finally, the ALJ found that Bamford's GAF score of 55

was inconsistent with her description of her limitations.  (AR 19, citing 866).  Under the

circumstances, therefore, this Court finds that the ALJ's finding of credibility was supported by

substantial evidence and must be affirmed.

       3.    <u>Bamford's Decision Not To Undergo Surgery</u>

Bamford argues that the ALJ mischaracterized the evidence when he concluded that she

was not disabled in part because she was not undergoing physical therapy, taking medication, or

agreeing to undergo surgery for her neck pain.  Mem. at 7.  The Court disagrees.

The ALJ did not conclude that the Plaintiff was not disabled due to her decision not to

follow the recommended treatment.  Instead, he concluded that her decision not to follow

recommended treatment was one factor that weighed against her credibility regarding her pain

complaints.  (AR 19).  "Where an applicant does not follow the prescribed medical advice which

would remedy or reduce his impairments, such conduct is 'arguably inconsistent with his

complaints of pain.'" <u>Torres-Gutierrez v. Sec. of Health, Education and Welfare</u>, 572 F.2d 7, 8

(1st Cir. 1978); <u>see</u> <u>also</u> <u>Sangel v. Astrue</u>, 785 F. Supp. 2d 757, 777 (N.D. Iowa 2011) (citation

omitted) ("A failure to follow a recommended course of treatment also weighs against a

claimant's credibility."); <u>see</u> <u>also</u> <u>Oliveira v. Astrue</u>, No. 10-10218-DPW, 2011 WL 3816521, at

*7 (D. Mass. Aug. 26, 2011) (affirming ALJ's credibility determination based on claimant's

refusal to undergo surgery, together with the record as a whole).  Accordingly, the ALJ

articulated good reasons supported by substantial evidence to discount Bamford's credibility,

including her decision not to undergo the recommended surgery.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, I recommend that the District Court GRANT Bamford's Motion to Remand [Docket No. 11], DENY the Commissioner's Motion to Affirm [Docket No. 16], and REMAND the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further findings and/or proceedings consistent with this report and recommendation.

V.    <u>REVIEW BY DISTRICT JUDGE</u>

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  <u>See</u> Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  <u>See</u> <u>Phinney v. Wentworth Douglas Hospital</u>,199 F.3d 1 (1st Cir. 1999); <u>Sunview Condo. Ass'n v. Flexel Int'l</u>, 116 F.3d 962 (1st Cir. 1997); <u>Pagano v. Frank</u>, 983 F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge

18